IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

TRACY RHINE,                          §
                                      §
VS.                                   §    CIVIL ACTION NO.4:11-CV-076-Y
                                      §
CITY OF MANSFIELD, TEXAS, et al.§

OPINION AND ORDER GRANTING THE MOTION FOR SUMMARY JUDGMENT,
DISMISSING REMAINING CLAIMS, and RESOLVING RELATED MOTION

In this case, Tracy Jo Rhine's only remaining claims are for
excessive force against individual defendants Carolina Ellison,
Leslie Jackson, and Edward Cervantez.[1] Rhine's active pleadings in
this case consist of a February 1, 2011 complaint; an August 25,
2011 response to an order for a more definite statement; and an
August 27, 2012 response to an order for a Federal Rule of Civil
Procedure 7(a) reply. Pending before the Court is the collective
motion for summary judgment of defendants Ellison, Jackson, and
Cervantes, filed on September 28, 2012. Accompanying the motion is
a brief in support and an appendix. On October 22, 2012, Tracy
Rhine filed a document entitled "Reply Brief to State Law Claims by
Defendants of Qualified Immunity," that, after review, is construed
as a response to the motion for summary judgment.  The defendants
then filed a reply to Rhine's response on November 5, 2012. All of
these materials are before the Court and will be considered in

---

[1]The Court has previously dismissed all other claims and defendants through
separate orders and judgments under Federal Rule of Civil Procedure 54(b).

review of the summary-judgment motion.[2]

*Preliminary Motion*

Rhine also filed, on November 16, 2012, a document entitled "Rhine's Response to Defendant's Allegations of Untimely Response," which the Court hereby construes as a supplemental response. But the defendants have also challenged this document with a motion to strike, arguing that Rhine's November 16 supplemental response is filed beyond the time allowed for responding to the motion for summary judgment, and was filed by Rhine without seeking leave of Court. Rhine then filed a response to the motion to strike in a document entitled "Opposition to Motion to Strike."

In the November 16 supplemental response, Rhine raises in section I the mailbox-rule arguments responsive to the defendants' contention that her October 22 document was filed too late. But in sections II and III of the document, Rhine presents additional substantive arguments responsive to the defendants' motion for summary judgment. The arguments and claims in sections II and III of the November 16 supplemental response are filed 45 days after the summary judgment motion. Thus, after review and consideration

---

[2]Although defendants argue that Rhine's "Response" file-stamped on October 22 was filed too late, because Rhine dated the document on October 16, 2012, while incarcerated at a halfway house, and as the 16th is within 20 days of the filing of the summary judgment motion, the Court will deem the response as timely under the prison "mailbox rule." *See Shockley v. University of Texas Medical Branch,* No.3-06-CV-223-K, 2008 WL 2223083, at *2 n.1 (N.D.Tex. April 29, 2008)(applying the mailbox rule to determine the date of filing of an inmate plaintiff's response to a motion for summary judgment), *rep. and rec. adopted*, 2008 WL 2223074 (May 15, 2008)(Kinkeade, J).

of the November 16 supplemental response, the motion to strike, and Rhine's response/opposition to the motion to strike, the Court strikes and will not consider in reviewing the summary-judgment motion the November 16, 2012 supplemental response, sections II and III.

*Summary-Judgment Evidence*

Defendants have filed an appendix in support of the motion for summary judgment that includes: the affidavit of Jana Davis, Mansfield Law Enforcement Center Jail Records Manager (Appendix 17), along with five pages of incident reports dated July 11, 2009 (Appendix 2-6); the affidavit of Carolina Ellison (Appendix 7-11); the affidavit of Leslie Jackson (Appendix 12-16); and the affidavit of Edward Cervantez (Appendix 18-21).  Rhine has not adduced any evidence in response to the summary-judgment motion other than what may be found in her more definite statement, which she expressly verified under penalty of perjury as true and correct. Because so verified, this Court is required to consider such pleading as summary-judgment evidence.[3]

---

[3] *See Muhammed v. Ness,* 15 F.3d 180, 1994 WL 24913, at *3 (5th Cir. January 14, 1994)(inmate's complaints made under penalty of perjury competent to raise a fact issue); *see also Nissho-Iwai American Corp. v. Kline,* 845 F.2d 1300, 1306 (5th Cir. 1989)(noting that although unsworn affidavit is incompetent to raise a fact issue precluding summary judgment, the statutory exception in 28 U.S.C. § 1746 permits unsworn declarations to substitute for an affidavit if made "under penalty of perjury" and verified as "true and correct.") Rhine did not so declare as to her original complaint or her Rule 7(a) reply.

*Summary-Judgment Standard*

When the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment is appropriate.[4]  "[A dispute] is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham."[5]  A fact is "material" if it "might affect the outcome of the suit under governing law."[6]

To demonstrate that a particular fact cannot be genuinely in dispute, a defendant movant must (a) cite to particular parts of materials in the record (e.g., affidavits, depositions, etc.), or (b) show either that (1) the plaintiff cannot produce admissible evidence to support that particular fact, or (2) if the plaintiff has cited any materials in response, show that those materials do not establish the presence of a genuine dispute as to that fact.[7]  Although the Court is **required** to consider only the cited materials, it **may** consider other materials in the record.[8]  Nevertheless, Rule 56 "does not impose on the district court a duty to sift through the record in search of evidence to support a

---

[4]Fed. R. Civ. P. 56(a).

[5]*Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001)(citation omitted).

[6]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[7]Fed. R. Civ. P. 56(c)(1).

[8]*See* Fed. R. Civ. P. 56(c)(3).

4

party's opposition to summary judgment."[9]  Instead, parties should "identify specific evidence in the record, and . . . articulate the 'precise manner' in which that evidence support[s] their claim."[10]

In evaluating whether summary judgment is appropriate, the Court "views the evidence in the light most favorable to the nonmovant, drawing all reasonable inferences in the nonmovant's favor."[11] Here, that means that the Court must take as true all of Rhine's verified and otherwise competent testimony found in her more definite statement but may accept as true the sworn and otherwise competent testimony of the defendants unless it is contradicted by Rhine in any verified statement. "After the non-movant [here, Plaintiff] has been given the opportunity to raise a genuine factual [dispute], if no reasonable juror could find for the non-movant, summary judgment will be granted."[12]

*Facts in Support of Summary Judgment Motion*

The remaining claims in the case arise from events that took place on July 10 and 11, 2009, while Rhine was housed at the Mansfield Law Enforcement Center (MLEC). On those dates, all defendants were working as corrections officers for MLEC--Ellison

---

[9]*Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 825 (1992).

[10]*Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

[11]*Sanders-Burns v. City of Plano*, 594 F.3d 366, 380 (5th Cir. 2010) (citation omitted)(internal quotation marks omitted).

[12]*Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

with a rank of corporal. Rhine complains in particular of two incidents that took place on July 11 in which force was used against her, which the Court will, consistent with the defendants' motion for summary judgment, label as event number 1 and event number 2.

*July 10, 2009*

On July 10, 2009, at 6:00 p.m., Rhine, while being moved from one cell to another, initially refused a directive from Corporal Ellison to step back, gave Ellison verbal threats, and appeared to Ellison to assume an aggressive demeanor. (Ellison ¶ 7.) As a result, Ellison directed that Rhine be placed in a segregated cell for security and safety purposes, which was done without incident. A segregated cell holds one inmate, and an inmate may be placed there when he has exhibited conduct or made threats indicating that the inmate might be a danger to other persons. (Ellison ¶ 7.) Although incident reports are required to be made only when force is involved, Ellison, apparently after the events of the next day as recounted below, prepared an incident report of the July 10, 2009 placement of Rhine in segregation. (Ellison ¶ 16.) Ellison's report recited that Rhine was placed in the segregation cell on July 10 after she had refused to wait in her cell while another inmate was moved, and after Rhine made threats, called Ellison a "bitch," and was aggressive in her language and movements. (Report of July 10 Incident--Appendix 2.)

*July 11, 2009–Event Number 1*

On July 11, 2009, around 11:00 a.m., Jackson reported to Ellison that Rhine had covered the window to her cell door and that water was coming out of the cell underneath the door. (Jackson ¶ 7.) The covering of the window prevented officers from observing and monitoring the cell, as they are required to do for the segregation cells every 15 minutes, and the presence of water on the floor indicated a slip and fall hazard or the possibility that the inmate had plugged up the toilet. (Ellison ¶¶ 8-9.) Rhine had covered the window with sanitary napkins. (Ellison ¶ 12.)  At this same time, Rhine had also been banging against the cell door or kicking it. (Jackson ¶ 9.)  Ellison looked through the only opening in the cell door, the slot to deliver a food tray, and observed Rhine. Because Rhine had previously displayed aggressive behavior, blocked the cell door window, and done something to cause water to flow under the door, Ellison asked Jackson and Cervantez to enter the cell with her. (Ellison ¶ 10, Jackson ¶ 9, Cervantez ¶ 9.)

Rhine says that, as the officers first entered the cell, Rhine was sitting on her bed. (Rhine's More Definite Statement (MDS) ¶ 6(b).) Ellison says that Rhine threatened her and stood in a fighting stance with closed fists. (Ellison ¶ 11.) These are not irreconcilable statements.  The Court harmonizes them and finds that Rhine was sitting on her bed when the officers entered but that she quickly became menacing.  Because of the perceived threat of violence and risk of harm to herself, the officers determined it

7

was necessary to control Rhine. (Ellison ¶ 11.) Cervantez and Jackson then grabbed Rhine's arms to place her on the ground, but she resisted.  After brief resistance, Rhine was placed face down on the floor of her cell, her arms were pulled behind her back, she was handcuffed, and the officers removed her shoes. (Jackson ¶¶ 11-12.) Afer the water had been cleared from the floor and the sanitary napkins removed from blocking the cell-door window, Rhine was released from the handcuffs but left housed in the segregation cell because of her behavior. (Ellison ¶ 13.)

Reports for the 11:00 a.m. incident were prepared later that day by both Ellison and Jackson. (Appendix 3-4.) Jackson's report memorialized that he observed Rhine banging on her door and shouting at another inmate prior to the entry by the three officers. (Appendix 3.) Ellison's report states that she had Officers Jackson and Cervantez enter the cell with her, whereupon Rhine began making threats, stating "she was going to get [Ellison]," and that Rhine got up from her bed with closed fists and took a fighting stance. (Appendix 4.) The report then notes that Rhine was brought face down on the floor, placed in handcuffs, and had her shoes removed. The report also notes the restraints were removed. (Appendix 4.)

*July 11, 2009—Event Number 2*

Around 2:15 p.m. on the same day, Ellison heard Rhine kicking her cell door, banging on her cell door, and otherwise raising a disturbance. Ellison believed that Rhine's conduct raised concerns

8

that she might injure herself. Thus, Ellison determined that, to minimize that threat, Rhine should be placed in a restraint chair. (Ellison ¶ 14.) The restraint chair is designed to keep a person under control so he is less likely to harm himself or another person. The chair has seatbelt-type restraints that can be fastened around the torso and arms and legs of the occupant of the chair. (Ellison ¶ 14.)  Ellison and Jackson thus reentered the cell and placed Rhine in the restraint chair, with each of them handling one side of her body. (Ellison ¶ 13, Jackson ¶ 16.) At Ellison's direction, Jackson then observed/monitored Rhine while in the restraint chair. After slightly less than 30 minutes, Jackson and Ellison, after observing that Rhine appeared willing to act in a nonviolent manner, removed her from the restraint chair around 2:43 p.m. (Ellison ¶ 15, Jackson ¶ 16.) Cervantez was not involved in this second event.

Incident reports were prepared by Jackson and Ellison for the second event. Jackson's, apparently written soon after, reported that he had assisted in placing Rhine in the restraint chair by securing her left shoulder and left leg into the chair. (Appendix 6.) Ellison's almost contemporaneous report notes that after Rhine was kicking and banging on the door, she was placed in the restraint chair for her safety at 2:15 p.m. and was observed by Jackson every 15 minutes. The report also notes that Rhine was removed from the restraint chair at 2:43 p.m. (Appendix 5.)

*Facts Alleged by Rhine*

9

As noted previously, Rhine has failed to articulate facts in response to the affidavits of the defendants, and in contest to their motion for summary judgment. But the Court must still consider and take as true the matters verified in Rhine's more definite statement.

As to the events of July 10, the night before the two use-of-force incidents, Rhine states that Ellison initially told her to pack her things for a move and then asked her to wait in the cell, causing Rhine to tell Ellison "you need to decide if you want me to hurry up or not." (MDS) at ¶ 4.)  Rhine contends that during the subsequent move through a sally port, Ellison kicked over her property, resulting in Rhine's telling Ellison "she wasn't going to pick it up and if anything was damaged, she would sue Ellison."[13] (MDS ¶ 4.) Rhine contends Ellison kept kicking her property, and acknowledges that she stepped towards Ellison, but was then held back by an officer who told her it "wasn't worth it," whereupon she entered the segregation cell without incident. (MDS ¶ 4.)

As to event number 1 of the next day, Rhine confirms that Ellison, Jackson, and Cervantez entered her cell. She does not deny that she arose from her seat on the bed and assumed a belligerent stance, and she confirms that Jackson grabbed her left arm and Cervantez her right. Rhine claims the officers damaged her shoulder

---

[13]Rhine's claims relating to the damages to her property were previously dismissed in this matter under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(I) and (ii).

when Cervantez "jerked her arm behind her[,] forcing her forearm high up on her back." (MDS ¶ 6(b).) Rhine alleges she screamed in pain. (MDS ¶ 6(b).) She says Jackson placed his weight on her back and Cervantez kicked her right side "at least five times, no more than 10." (MDS ¶ 6(c).) Rhine believes two or three other officers were present, but she reports that when she attempted to look to the right to see them, she was threatened with pepper spray. (MDS ¶ 6(c).)

As to the second event later in the day on July 11, Rhine says that she kept requesting medical attention and for photographs to be taken, but was told "to be quite [sic] and that [she] wasn't gonna get any medical care." (MDS ¶ 7(b).) She acknowledges she was "knocking on the door and requesting medical care." (MDS ¶ 7(b).) Rhine writes that Ellison, Jackson, and two other male guards then entered her cell and, although her "shoulder required attention," she complied with their request to place her hands behind her back. She complains that they then placed the handcuffs on her too tightly and, when she complained, "Jackson replied 'oh well.'" (MDS ¶ 7(b).) Rhine acknowledges that she was then placed in a chair-like device with her hands restrained behind her back, but insists that the employees knew the cuffs were too tight and that her shoulder was injured. (MDS ¶ 7(b).) She contends she was in the restraint chair for 45 minutes to an hour, and that her wrists were bruised such that "it took 10-14 days to clear up." (MDS ¶ 7(b).)

Rhine believes that the force used in each incident was "in retaliation for July 10, 2009," and was applied because she "had no outside support" and because defendants felt like they could, as Cervantez bragged, "cut loose . . . ." (MDS ¶ 8.) She also believes "they felt they could use me as their training dummy." (MDS ¶ 8.) Rhine contends that she did not refuse to comply with any directives just prior to the use of force, but she acknowledges that she continued to request medical attention "every few minutes" just prior to the second incident. (MDS ¶¶ 10-11.) Rhine believes the force was used with the deliberate intention to harm her. (MDS ¶ 12.) She supports this belief by stating that the officers laughed and joked prior to each episode, and "kept coming to her door making verbal threats, insults and comments." (MDS ¶ 13.)

*Analysis--Qualified Immunity*

Rhine seeks relief in this case under 42 U.S.C. § 1983, which "creates a private right of action for redressing the violation of federal law by those acting under color of state law."[14]  "Rather than creating substantive rights, § 1983 simply provides a remedy for the rights that it designates. Thus, an underlying constitutional or statutory violation is a predicate to liability under § 1983."[15]

Defendants seek summary judgment on the basis that they are

---

[14]*Colson v. Grohman,* 174 F.3d 498, 504 n.2 (5th Cir. 1999)(citing *Migra v. Warren City Sch. Dist. Bd. Of Educ.,* 465 U.S. 75, 82 (1984)).

[15]*Harrington v. Harris,* 118 F.3d 359, 365 (5th Cir. 1987)(citations and internal quotation marks omitted)(quoting *Johnson v. Harris Cnty, Flood Control Dist.,* 869 F.2d 1565, 1573 (5th Cir. 1989)).

entitled to qualified immunity from Plaintiff's claim of a constitutional violation.[16] The doctrine of qualified immunity "protects government officials from suit and liability for civil damages under § 1983 insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[17] This is an affirmative defense that balances the important interests of holding "public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."[18] Because an official is entitled to immunity from suit, not merely from liability, immunity questions should be resolved at the earliest possible stage in the litigation.[19]

The Supreme Court has developed a two-step inquiry for resolving government officials' qualified immunity claims: (1) whether the facts that the plaintiff has **alleged** (at the motion-to-dismiss stage) or **shown** (at the summary-judgment stage) make out a violation of a constitutional or statutory right; and (2) whether the right at issue was "clearly established" at the time of the

---

[16]The defendants also include a section in their motion for summary judgment and in their brief in support, challenging "the event Plaintiff tries to make a tardy claim that she pursued claims against current or former Defendants under Texas law." (Brief in Support of MSJ Section IV.) Plaintiff has never asserted state law claims in this lawsuit, and thus, these arguments will not be addressed.

[17]*Byers v. Navarro County*, No.3:09-CV-1792-D, 2012 WL 677203, at *2 (N.D.Tex. Mar. 1, 2012)(Fitzwater, CJ)(citing *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) and *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).

[18]*Pearson,* 555 U.S. at 231.

[19]*Hunter v. Bryant,* 502 U.S. 224, 227 (1991).

defendant's alleged misconduct.[20] Although the Supreme Court previously mandated that the two steps be resolved in sequence, in *Pearson v. Callahan*, it gave the lower courts permission to use discretion in deciding which of the two prongs to address first in light of the circumstances of the particular case.[21] In conducting the inquiry under the first prong--whether the Plaintiff has alleged or shown a violation of a constitutional right--the Court is to "employ currently applicable constitutional standards."[22]

In resolving the second prong--whether the right allegedly violated is "clearly established"--the contours of the right must be "clearly established" in a particularized sense to the context of the case, so that a reasonable official could be expected to understand that what he is doing violates that right.[23]  This Court finds instructive the enunciation of the second prong analysis in *Wernecke v. Garcia*:

> "The 'clearly established' standard does not mean that officials' conduct is protected by qualified immunity unless 'the very action in question has previously been held unlawful.'" [*Kinney*] at 350 (quoting *Anderson*, 483 U.S. at 640). "[W]hat 'clearly established' means . . . depends largely 'upon the level of generality at which the relevant "legal rule" is to be identified.'" *Wilson v. Layne*, 526 U.S. 603 614(1999)(quoting *Anderson*, 483

---

[20]*Pearson*, 555 U.S. at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

[21]*Pearson*, 555 U.S. at 236 (rejecting the prior holding in *Saucier v. Katz*, that the analysis was a mandatory two-step sequence); *see also Lytle v. Bexar County, Tex.*, 560 F.3d 404, 409 (5th Cir. 2009), *cert. den'd*, 130 S.Ct. 1896 (2010).

[22]*Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004)(en banc).

[23]*See Id.*, at 349-50 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Saucier*, 533 U.S. at 202.

U.S. at 639). "[A]n official does not lose qualified immunity merely because a certain right is clearly established in the abstract." *Kinney,* 367 F.3d at 350. Officials should receive the protection of qualified immunity "unless the law is clear in the more particularized sense that reasonable officials should be 'on notice that their conduct is unlawful.'" *Id.* (quoting *Saucier,* 533 U.S. at 206). The court's focus, for purposes of the "clearly established" analysis, should be on "fair warning": qualified immunity is unavailable "despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Hope v. Pelzer,* 536 U.S. 730, 740 (2002).[24]

In this case, the Court will resolve the defendants' summary judgment motion through analysis of the first prong.

A qualified-immunity defense alters the usual summary judgment burden of proof.[25] When a defendant has asserted that defense in a summary-judgment motion, the burden then shifts to the plaintiff to demonstrate the inapplicability of the defense.[26] But, being the non-moving party, all inferences are drawn in the plaintiff's favor.[27] Nevertheless, conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation will not suffice.[28]

*Violation of a Constitutional Right*

---

[24]*Wernecke v. Garcia*, 591 F.3d at 393.

[25]*See Brown v. Callahan,* 623 F.3d 249, 253 (5th Cir. 2010), *cert. den'd,* 131 S.Ct. 2932 (2011).

[26]*McClendon v. City of Columbia,* 305 F.3d 314, 323 (5th cir. 2002)(en banc)(per curiam).

[27]*See Brown,* 623 F.3d at 253.

[28]*See Edwards,* 476 Fed. Appx. at 328 (quoting *Oliver v. Scott,* 276 F.3d 736, 744 (5th Cir. 2002)).

Rhine seeks relief under § 1983 on the basis that defendants used excessive force against her while she was a pre-trial detainee at the MLEC.  As a pre-trial detainee at the time of the events made the basis of this case, Rhine's rights flow from the procedural and substantive guarantees of the Fourteenth Amendment.[29] For a pretrial detainee to show the constitutional violation of excessive force, he must establish that the force was not applied in a good-faith effort to maintain or restore discipline, but rather was applied maliciously and sadistically with the intention to cause harm.[30] The plaintiff bears the burden of showing: "(1)an injury (2) [that] resulted directly and only from the use of force that was excessive to the need and (3) the force used was objectively unreasonable."[31] Although a showing of significant injury is not necessary, a plaintiff must show that he suffered

---

[29]*See Jackson v. Culbertson,* 984 F.2d 699, 700 (5th Cir. 1993)(noting that excessive-force claim by pre-trial detainee is governed by the Due Process Clause rather than the Eighth Amendment)(citing *Valencia v. Wiggins,* 981 F.2d 1440 (5th Cir. 1993)).

The defendants erroneously recite the Fourth Amendment excessive-force standard stated in *Williams v. Bramer,* 180 F.3d 699, 703 (5th Cir.), *clarified on rehearing,* 186 F.3d 633 (1999). The Fourth Amendment excessive-force standard was articulated by the Supreme Court in *Graham v. Connor,* 490 U.S. 386 (1989). The Fourth Amendment, however, is not "[the] appropriate constitutional basis for protecting against deliberate official uses of force occurring . . . *after* the incidents of arrest are completed, *after* the plaintiff has been released from the arresting officer's custody, and *after* the plaintiff has been detained awaiting trial for a significant period of time." *Valenica,* 981 F.2d at 1443-44 (emphasis in original).

[30]*Edwards,* 476 Fed. Appx. at 328 (citing *Hudson v. McMillan,* 503 U.S. 1, 5-10 (1992) and *Valenica,* 981 F.2d at 1446));*see also Byers,* 2012 WL 677203, at *4 (N.D.Tex. March 1, 2012)("Although convicted prisoners are protected against excessive force under a different constitutional provision (the Eighth Amendment), it is well established that the same standard and protection apply to both pre-trial detainees and convicted prisoners when the claim involves excessive force use to   restore institutional order")(citations omitted) (Fitzwater, CJ).

[31]*Glenn v. City of Tyler,* 242 F.3d 307, 314 (5th Cir. 2001).

some form of injury that is more than de minimis.

*Event 1*

A review of the events preceding the first use of force, identified as Event 1, shows that Rhine was in a segregation cell because of her aggressive conduct, which included verbal threats made towards Corporal Ellison. Correctional officers know that when a prisoner is placed in a segregation cell it is generally because the prisoner has engaged in conduct whereby the prisoner might be a danger to other persons. (Ellison ¶ 8.) MLEC personnel are required to monitor the prisoners in isolation or segregation cells approximately every 15 minutes to ensure that the prisoners are not harming themselves or damaging the interior of the cell or experiencing any needs. The monitoring is carried out by looking through a small viewing window. (Ellison ¶ 8.) Rhine had used sanitary napkins to cover the viewing window, and therefore she could not be monitored. After covering the window, Rhine made a disturbance by kicking and banging on the cell door and yelling. She also managed to cause water to flow underneath the cell door into the hallway adjacent to her cell. (Ellison ¶ 8.) The presence of water on the floor caused the corrections officer defendants to have concerns that the floor could be dangerously slippery, the plumbing might be broken or plugged up and, if the toilet was overflowing, waste water could be on the floor. (Ellison ¶¶ 8-9; Cervantez ¶ 7.) Although Rhine recites that she only spilled a cup of water, and was banging on the doors because requests for medical

care were not responded to, she acknowledges that she spilled water on the floor and was creating a disturbance. (Rule 7 Reply.)

Against this background, the correctional officers had reason to enter Rhine's cell. And, once she displayed conduct suggesting that she might cause a violent and potentially dangerous confrontation, the officers were justified in entering together. (Ellison ¶ 10.)  All three officers note that, upon entry, Rhine immediately threatened Ellison and put herself into a fighting stance. This conduct, against the background of her other conduct, was an indication that Rhine posed an immediate risk of violence towards the officers. Rhine acknowledges that she had covered the window of her cell door, but claims "like all other inmates in isolation [I] covered [the] window while showering, no other inmates were beaten for engaging in such conduct." (Rule 7 Reply at 3.)  Rhine also claims she had not refused or resisted, and had done nothing, but she also admitted she "spilt a cup half full of water." (Rule 7 Reply at 3.) Because the officers had a legitimate reason to want to clear the window, check the plumbing, and clean up the water, there was a need to control Rhine without engaging in a fight. (Ellison ¶¶ 11-12.) Defendant Officers Jackson and Cervantez grabbed Rhine's arms to place her on the ground in her cell.  During this process, Rhine struggled and resisted the officers, and the officers were able to pull her arms behind her back so that she could be secured by handcuffs. (Jackson ¶¶ 10-11; Cervantez ¶¶ 9-10.) Rhine does not contend that Ellison engaged in any part of this physical struggle. Jackson and Cervantez used an

amount of force reasonably necessary to control Rhine in order to clear and clean the cell. (Jackson ¶ 16, Cervantez ¶ 13.)

Rhine was only handcuffed long enough to allow the officers to remove the sanitary napkins from the cell window, clear the water from the floor of the cell and adjacent hallway, check on the plumbing in the cell, and remove Rhine's shoes to discourage her from continuing to kick the door to her cell. (Ellison ¶ 13.)

*Event Number 2*

A few hours after the first event, Rhine was again yelling, kicking her cell door, and banging on the door with her hands and arms. She was barefoot at that time because her shoes had been removed to discourage her from kicking the door after the earlier incident. (Ellison ¶¶ 13-14.) Rhine's conduct of continuing to kick the door with her bare feet and pounding on the door was severe enough that Ellison was concerned Rhine might injure herself. Thus, Ellison decided to place Rhine in a restraint chair. The restraint chair is used at MLEC to keep inmates under control so they are less likely to harm themselves or harm another person.  The chair is low to the ground and is otherwise designed to minimize the potential for injury to the secured person, and allow the person to be restrained with a seatbelt-like device around the torso and arms and legs of the occupant. (Ellison ¶ 14.) Ellison and Jackson secured Rhine in the chair.  Rhine was then monitored by Jackson, but Rhine was kept in the chair for less than an hour, even according to Rhine.  (Appendix 5, Ellison ¶ 15; Rhine MDS ¶ 7(b).)

The Court concludes that the force used in each of these

events did not rise to the level of a constitutional violation.  As noted above the "core judicial inquiry . . . is whether force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."[32]  In making the determination, courts consider several factors, including: (1) the need for the application of force; (2) the relationship between the need and the amount of force used; (3) the threat reasonably perceived by the responsible officials; (4) any efforts made to temper the severity of a forceful response; and (5)the extent of injury suffered.[33]  While a malicious and sadistic use of force to cause harm violates contemporary standards of decency, not "every malevolent touch by a prison guard gives rise to a federal cause of action."[34]  Because a "detention facility official may have to act quickly and decisively," he is "entitled to wide-ranging deference."[35]

In the first event, the interaction of the officers with Rhine resulted only from efforts to respond to the conditions Rhine created, including blocked access to view her, water on the floor, and threatening and disturbing conduct. Although Rhine alleges the force was used in retaliation for the events of her interaction with Ellison the night before, as noted above, speculation and

---

[32]*Mitchell v. Cervantes,* 453 Fed. Appx. 475, 477 (5th Cir. Dec. 12, 2011)(quoting *Hudson,* 503 U.S. at 6-7)(other citations omitted)).

[33]*Baldwin v. Stadler,* 137 F. 3d 836, 839 (5th Cir. 1998)(citations omitted).

[34]*Hudson,* 503 U.S. at 10.

[35]*Valencia,* 981 F.2d at 1446; *Baldwin v. Stadler,* 137 F.3d 836, 840 (5th Cir. 1998).

unsubstantiated allegations would not enable a reasonable trier of fact to find that the defendant's conduct violated her constitutional rights.[36]   Rather, the defendant officers entered the cell in an effort to insure Rhine's safety and to ensure and/or restore discipline.  Upon encountering Rhine in a threatening stance, their actions in holding and pulling Rhine's arms back to restrain and handcuff her could be seen as reasonably related to the threat they perceived. Although Rhine alleges that she suffered injury to her shoulder, she has not clearly connected that allegation to the force used. Also, although Rhine alleges Cervantes kicked her torso between 5 and 10 times, even if such conduct occurred, Rhine alleges no injury whatsoever resulting from the alleged kicking.[37]

In the second event, Officer Cervantez was not involved, and thus Rhine has no claim against him for this event. As to officers Ellison and Jackson, the officers entered Rhine's cell a second time because she was continuing to bang on the door, even after they had previously retrained her. Rhine acknowledges that she was continuing to bang on the door. In light of these facts, the officer certainly could have perceived a need to take further action to restore and maintain discipline and to prevent Rhine from harming herself.  Rhine complains that the handcuffs were placed on

[36]*See Edwards,* 476 Fed. Appx. at 328.

[37]*See generally Williams v. United States,* No. H-08-2350, 2009 WL 3459873, at *13 (S.D.Tex. Oct. 20, 2009)(noting that as to inmate's claims that he suffered severe bruising, scrapes, and pain from being kicked and sprayed with pepper spray, "while the shoving and kicking, as alleged by the plaintiff, may have been unnecessary and inappropriate, the minor injury inflicted support the conclusion that the harm was no more than de minimis").

her wrists too tightly, resulting in bruises. An allegation that handcuffs were placed on too tightly, without more, does not constitute excessive force.[38] And, Rhine was placed in the restraint chair for only a brief period of time, and she does not allege that any harm or any form of injury, whether or not de minimis, resulted from her placement in the chair.[39] Furthermore, nothing recited by Rhine would enable a reasonable trier of fact to find  that the defendants placement of her in the restraint was taken with a malicious or sadistic purpose.[40]

In sum, the undisputed competent summary judgment evidence reveals that plaintiff Tracy Rhine has not shown she was subjected to excessive force and thus has not stated a constitutional violation under the Fourteenth Amendment. Defendants Ellison, Jackson, and Cervantez are entitled to summary judgment based on qualified immunity because plaintiff Rhine has not satisfied the first prong of the qualified-immunity analysis.

---

[38]*Lockett v. New Orleans City,* 607 F.3d 992, 999 (5th Cir.)(rejecting Lockett's claims based merely on allegations that handcuffs were too tight) (citing *Glenn,* 242 F.3d at 314 *and Freeeman v. Gore,* 483 F.3d 404, 417 (5th Cir. 2007)(where the court of appeals deemed plaintiff's injury claim that "the deputies twisted her arms behind her back while handcuffing her, 'jerked all over the carport,' and applied the handcuffs too tightly, causing bruises and marks on her wrists and arms" as *de minimis*)), *cert. den'd,* 131 S.Ct. 507 (2010).

[39]*See Byers,* 2012 WL 677203, at *6 (noting that pre-trial detainee had not recited any allegations of injury from placement in restraint chair)(citing *Galada,* 421 Fed. Appx. at 462 (pre-trial detainee failed to show some form of injury that was more than de minimis)).

[40]*See Byers,* 2012 WL 677203, at *6 (citing *Blakeney v. Rusk County Sheriff,* 89 Fed. Appx. 897, 899 (5th Cir. 2004)(upholding trial court's determination that jail officials did not violate the Due Process Clause when they placed a pre-trial detainee in a restraint chair for 20 hours)).

*ORDER*

Therefore, the defendants' motion to strike plaintiff Rhine's November 16, 2012 Response (doc. 63) is GRANTED only in that sections II and III of that document will not be considered by the Court in reviewing and ruling upon the motion for summary judgment.

Furthermore, the motion for summary judgment filed by the remaining defendants (doc. 54) is GRANTED. Plaintiff Tracy Rhine shall take nothing on her remaining claims raised in this suit against defendants Carolina Ellison, Leslie Jackson, and Edward Cervantez, and all such claims are DISMISSED WITH PREJUDICE.

SIGNED March 21, 2013.

Terry R. Means
_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE